May it please the court, this is an appeal of preliminary injunction entered in a labor dispute by the district court in aid of an ostensible ongoing labor arbitration. Because the injunctive decree arose in the context of a labor dispute, it was subject to the Norris LaGuardia Act. Section 104 of the Norris LaGuardia Act withdraws jurisdiction from federal courts to quote issue a preliminary injunction in any case involving a labor dispute. This court should dissolve the labor injunction because it violates the Norris LaGuardia broad anti-injunction mandate. The trial court abused its discretion when it concluded that the case qualifies for the narrow exception to Norris LaGuardia that this court articulated in its 1976 Lever Brothers decision. Lever Brothers is a very limited exception to Norris LaGuardia. It authorizes intervention in a labor dispute only where the arbitration process would be rendered a hollow formality in the absence of an injunction. To satisfy that test, the petitioner must show that the arbitration process would be essentially rendered futile if the status quo is not maintained. In Lever Brothers, for example, the fact situation was that the employer was in the process of permanently relocating its business. And the court concluded in that situation there would be nothing left for the arbitration decision to remedy if the relocation were not enjoined until the arbitrator decided whether that would breach the contract or not. In the 40 years since Lever Brothers, this court has found that the hollow formality test was satisfied in only two labor cases arising under the Norris LaGuardia Act. They are both readily distinguishable because each situation there did involve a pumpy-dumpy scenario where if an injunction had not been entered, the situation could not be restored to status quo. For example, in Acres, which was an injunction of pre-arbitration… You're making your Section 101 argument now. Pardon? You're making a Section 101 argument now. Correct? Well, yes, in the sense that the Lever Brothers exception would be a waiver or an exception to the broad vision of Norris LaGuardia. Right. You also make – on brief, you make the Section 301 argument, too. Yes, that's correct. Sorry. The 301 argument is not part of this argument. But you're going to make that at some point. Yes, Your Honor. That's a second independent case. We believe that Norris LaGuardia is really dispositive of this case just due to the factual nature of the issue that was before the district court. So in Acres, which is really the only pre-arbitration injunction that this court has affirmed, as an exception to Norris LaGuardia, there was a permanent liquidation of the business that was ongoing. And so the court concluded that that would be something that even a favorable arbitration decision couldn't restore to status quo ante. The second labor case actually involved an injunction that was entered post-decision, but the union had struck because presumably they didn't like the arbitration decision. So the court approved the entry of an injunction more akin to a boy's market type strike situation. Another hollow formality test in which the court did find that the injunction was appropriate as a hollow formality actually involved the FAA, not Norris LaGuardia, but it does illustrate the kinds of facts that it takes in order to affirm an injunction because it would essentially render the arbitration process futile. And that involved a brokerage arrangement in the Merrill case where the broker left. And during arbitration, he was soliciting clients from Merrill Lynch, and the court enjoined that because once solicited, there was no way to remedy that situation. Every other case involving an exception to the Norris LaGuardia prohibition against injunctions that this court has reviewed, the district court's injunction has been dissolved for one reason or another. These cases are all cited in our brief, except the decision in CSX Transportation, which is the situation I mentioned where the court post-award affirmed an injunction because the union had struck, and that decision is at 86 F3, 346. The court's hollow formality jurisprudence demonstrates that the trial court misapplied the law when it concluded that Lever Brothers applied in this situation. There was no record evidence that the retirees could not have been restored to the health plan that was in effect should they prevail in arbitration. Are there any of the retirees in this case who would not be Medicare eligible? No, Your Honor. By definition, the transition to the health retirement account scenario for providing benefits only applied to the participants in the plan who were age eligible for Medicare because those are the only people that could get into these Medicare supplement plans. What would happen if there's a retiree who's not Medicare eligible? The plan continued in effect. The plan was not terminated, so those people all remained in the plan. You could have a retiree who was eligible for Medicare who would be in the HRA system and get the $4,500 to $5,500 cash to buy plans with, and the spouse would still be in the main plan because she's not eligible for that. So the impact, there would be no impact on any plan beneficiary other than the transition for the Medicare eligible people into the HRA type plans that they would buy with the money that was put in the HRA account. And because there was no claim or finding that an arbitration decision could not restore the beneficiaries who would be affected by management's decision back into the group plan, if that's the way the case came out, there really is no basis under this court's jurisprudence to conclude that arbitration itself would be a whole formality. It's not a scenario where the plan is being moved or assets are being sold without the buyer being required to honor a labor agreement or take the employees. And it's not even a case where retiree benefits are going to be terminated, which might in and of itself, if that were the fact, suffice to demonstrate that you couldn't restore the situation back to status quo ante. So the fundamental requirement here to take advantage of the Lieber brothers' exception was not established on these facts. and found that instead, the irreparable harm to the retirees during dependency of the injunction proceeding was a sufficient basis to enjoin management's decision to implement the HRA concept. The problem, the findings to support this, whether it be in the context of a Norris LaGuardia exception injunction or a plain vanilla type injunction that requires this court to find or the trial court and this court to find irreparable harm is that on the facts in the case, there isn't any irreparable harm. Because this was not a situation in which benefits were going to be terminated. It was a transition to a different way of providing the benefits. There was extensive testimony in the record by the healthcare consultant who led the team that devised this HR arrangement that demonstrated the extremes to which the company had gone in order to make sure that nobody was going to be hurt, including the providing of individual assistance through a company that specializes, and there are several of these companies around, and RIDOFT is one that is certified by CMS to provide this relocation, or not relocation, but service to assist retirees find the plans, these Medicare supplement plans and prescription drug plans that best fit their situation. So all of the court's findings about harm, about loss of benefits, they were simply speculative. They were kind of fearful type findings because there wouldn't be any harm or loss of healthcare to anybody during the arbitration process. We have, and one final point I wanted to note. Before Judge Agee asked you a question, and you're going to bypass it, terrible mistake on your part.  Before I go to 301, let me just say that the fact the injunction was entered seven months ago and we still don't have any movement on the arbitration is sort of self-proving that by entering the injunction, the court did not facilitate the quick disposition of arbitration because we really have no idea when anything will happen. There's no incentive for anybody to do anything now since the case has been enjoined. Turning to the 301 jurisdiction. That would include your client, too? You're saying that they had no incentive to move forward in arbitration? We are enjoined from doing anything. I know, but you said no one has an incentive. Well, no one who's involved in processing the arbitration. Not your client. Not our client, right. The union, the retirees, the arbitrator, i.e., the trustees who are the arbitrators here. The matter's frozen, so it's now a back burner for them. With respect to 301, 301 of the Labor-Managed Relations Act applies to contracts between unions and signatories to contracts. Consol Energy, the defendant in this case, is not a signatory to the contract. On its face, therefore, it's not subject to Section 301 jurisdiction. For example, it can't be compelled to arbitrate because it never entered into an agreement with the union to arbitrate. So this case is really positioned wrongly in the sense that a Section 301 action is brought against a parent company that is not signatory to any agreement with the union. That turns logic on its head, doesn't it? Your client is the one who's funding it, who's responsible, correct? Not legally. Not legally. They're actually responsible. Absolutely. So who would be enjoined? These other companies don't exist anymore, do they? They exist. They have offices. They have directors. They legally exist. All corporate formalities are complied with. On paper, they exist. But that's the formality. I understand your own point. That's the formality that makes the law look stupid. I mean, your client is the one who's really having these funds that people depend upon for their medical. Right. But that doesn't make them a signatory to the contract. No. Well, I mean, if you narrow it in that sense, but enough that you would say there's no one to be enjoined, they can't be enjoined, although they would have the responsibility? The court doesn't have jurisdiction under 301. Okay. If there were entities properly in front of a court that were subject to 301, such as the signatory companies themselves, then the court could validly issue an injunction under 301. And in fact— I thought that the union had, or the labor, whoever it was, had joined all these subsidiaries and that they were then dismissed. They were because this court did not have jurisdiction. The court itself concluded that it didn't have personal jurisdiction over the companies. And one of the interesting parts of this case is that those subsidiaries had separately filed in Pennsylvania under 301 where they were located and in a court that did have jurisdiction over them, seeking a declaration as to whether they were obligated to arbitrate this dispute. Is that pending? That case was dismissed, Your Honor. It was first stayed because of the ongoing West Virginia proceedings and then subsequently dismissed once the court entered its injunction, so there's nothing pending in Pennsylvania now. I thought the case was transferred to West Virginia. It was transferred, but since the companies are not subject to personal jurisdiction in West Virginia, they voluntarily dismissed the case. So there's no case residing under— The union voluntarily dismissed the subsidiaries? The subsidiaries filed a voluntary dismissal of their case after the Pennsylvania judge transferred it here because there's no jurisdiction over them here. But the union could sue the subsidiaries in Pennsylvania under Section 301, couldn't they? Exactly. And that was our argument was that— So what is that? I mean, you send them off as like saying, well, you know, there's a desert out there, but people need a glass of water, but you send them out to the desert. It's crazy. Well, it was the union's choice, Your Honor. The union chose to file this lawsuit in the southern district of West Virginia where they did not have jurisdiction over the signatory companies that were subject to the obligation to provide these benefits to their employees. Well, personal jurisdiction is a totally different issue not before us, but if a court doesn't have personal jurisdiction over a company, it can't do anything, can it? That's our point. I mean, it seems to me pretty obvious that if the union wants to get a 301 remedy, it sues the signatories in a place where it can sue. I don't understand what the gamesmanship here is. Well, I'll let you ask that question to Mr. Treanor, but I think that the gamesmanship was because they wanted to be in the southern district of West Virginia because there was a more favorable law perhaps on the merits. But you're right. They should have and could have filed this suit in Pennsylvania at Diago or joined in the suit that the signatory companies themselves filed there. So, Judge Gregory, in response to your concern, I understand. I'm not quite dumb on this. Yes, the parent corporation is the plan administrator of this plan and is ultimately responsible for its administration. But when we look at 301, that's not the test. Otherwise, every plan administrator could be brought in under Section 301 jurisdiction because they administer the plan and they make these health care decisions. So, the legal question is whether 30-may I continue? Yes. The legal question under 301 is did this district court have jurisdiction over this motion, which was filed solely under 301 and solely to obtain an injunction? And we submit it did not because it was never signatory to this agreement. The union never demanded in the course of bargaining that the parent company submit to the agreement or be bound to the agreement. It could have, but it did not. So, it's a choice of forms, and they chose a form in which they cannot mount the 301 claim because that form doesn't have subject matter jurisdiction over a non-signatory. And with respect to the finding the district court made that caused it to conclude it could take jurisdiction nevertheless, is solely based, well, not solely, but principally based on a letter that the CEO of the parent company exchanged with the president of the union that merely, and I call your attention to the letter because I think it's crucial for 301 purposes because the union said it's a formal contract. And the letter, which is in the Joint Opinion 167, when you read the letter, it's merely a confirmation that the parties with respect to the benefit plan have agreed on a particular managed care system and drug formulary and other things dealing with the plan. There's no suggestion here that this is any kind of a formal agreement in the nature of a contract. It's also signed by a different entity. It's signed by the president. Yes, it's signed by the association. No, this letter itself is signed by, the letter about managed care is signed by the CEO of the plan administrator, Consol Energy, but the plan document and the labor contract. Was that the July 1 letter? Yes, sir. Yes, your honor. I thought it was the bituminous co-op. Yeah. Well, he signed it as the chairman of the- What do you mean he signed it as? He signed it the only person signing the letter on the face of the letter. What page is that on in the record? 167. It's signed as the chairman of the BTOA negotiating committee. Negotiating committee. And the head is the Bituminous Operators Association, and he signed in as a negotiating committee of that association. Correct. Consol's not a party to that letter in any way. Only in the sense that it's confirming that Consol, which is a BTOA member- Why are you saying that? Because he's telling me this is his position. No, I'm looking at the face of the letter. Just show me on the letter where this is signed by Consol. It's not signed by Consol. Of course not. It's signed by an officer of Consol. It doesn't matter. He's also serving as the officer of the negotiating committee for the association. Exactly. And the association is signing the letter. He's signing in his representative capacity as the- He's not signing as representative. He is signing for the association committee. When I say IBM Corporation by Jones, its vice president, that's an IBM letter. Correct. Correct. This is signed as chairman of BTOA. But it's more capacity, as you would explain, before I cut you off, that even though there is, you can have more than one capacity. It is negotiating, but he was also representing something as the consolidator. Was he not? That's what you were explaining. The letter pertains to Consol's-let's remember, the panel may not be aware of this, but the member companies of BTOA were Consol's UMWA subsidiaries. So he had the dual role of being chairman of the negotiating committee, not president of the BTOA. The president of the BTOA actually signed the contract, signed the employer benefit plan that they issue here. Well, Consol's not a member of the association. Correct. It's not a member. Okay. Now, the association signed this, and they're signing it and referring to Consol as the administrator of the plan. Consol's role in this case, I understand your position, and I'm sort of curious about your relaxed approach to this, but Consol's position in this case is administrator of the plan. Correct. Which is provided to the coal companies that are signatories to the collective bargaining agreement. Correct. The coal companies sponsor the plan, and the plan that is negotiated by BTOA authorizes the companies to either be the plan administrator or to determine who would be their plan administrator. And in this case, Consol Energy was designated as the plan administrator, as we explained in our briefs. Consol Energy, the parent, takes that position with respect to all of its subsidiaries so that it can maintain legal compliance with their, ensure that all risk obligations are complied with. It doesn't make them, though, responsible for the contractual obligations that the signatory companies themselves have undertaken in this plan. So there's no 301 jurisdiction because this letter is not a formal contract between Consol Energy and the UMWA. It merely references managed care. You know, it was a very thin read and not a sufficient factual read to establish a signatory 301 relationship. I don't understand why you're conceding all this. It's a thin read. It's not a read at all. It's not, well, I- The collective bargaining- Charitably, it's a thin read. I remind you, it's not a read at all. Well, why don't you state your position? The collective bargaining agreement is signed by the BOAC members. And in the collective bargaining agreement, the members agree to provide a health care plan. And in providing that health care plan, they enlisted Consol, which administers the plan. But the plan is administered in compliance with the obligation of coal companies, subsidiary coal companies, to provide health care. And they're the ones obliged, not Consol. That's our position. That's your position. That's what you stated, but you seem to be wanting to compromise it and say, well, there's a thin read here and you can do this. Well, I'm speaking on behalf of Consol. I suspect, Counsel, you did it because it's somehow the burden of truth in what you're saying. That is, obviously, Consol is operating more than just a plan administrator. They're the ones who fund this plan. Actually, I'm trying to be charitable to the district court, Your Honor. That's the read, if you will, that the district court used to find 301 jurisdiction. The court did not. The accuracy of this is the district court said Consol was an agent of the subsidiary companies. And therefore, it was the party in interest. That was its conclusion. Correct. Of course, as you know, an agent in a contractual circumstance is not contractually liable and, therefore, is not the party in interest. It's just a misstatement of law. I agree. And that's why there really is no 301 jurisdiction here because the things the district court relied on to find it are either errors of law or errors of fact. So there is, in final response to Judge Gee's question on 301, there is no jurisdiction here because you do not have a party that is bound to an actual enforceable agreement with the UMWA that is necessary to trigger that. And in all the cases where, and there are cases where courts have found that it doesn't have to be a CBA, but in every such case, it has been an agreement between, at least every case I'm aware of, it has been an agreement between a union and an employer. It might be a settlement agreement. It might be a side agreement. But it's always been. Your position is your client has no contractual obligation to continue to do anything with respect to the medical benefits of these retirees. No obligation under the labor agreement. That's correct. At all. Or any other agreement. Or any other agreement. So these companies are now on existing paper and they're gone. They have no funds, really. So then, really, it can just be over. These retirees get nothing. Right? Because you said your client has no obligation. Well, they have no contractual obligation. Excuse me? What obligation does it have? You seem to suggest that you qualified if I said no contractual. Is there any obligation it has? There is no contractual obligation. No. Try to answer my question. I know it's hard. Keep focus on it because I'm asking the question now. Is there any obligation? You said there's no contractual. Now, that seems to be qualifying. Do you mean to say that there's none? There is no legally enforceable obligation, which doesn't mean that companies don't continue to provide benefits to retirees. So you're doing it just for the goodness of your company's heart? Well, Judge Gregory, all I can tell you is there's nothing in this labor contract that requires the non-signatory. The truth is a stubborn fact. It makes no sense we argue here in terms of signatory. That letter clearly said the counsel's position was, and that's why you've done it, because there is an obligation. The question is whether or not it was agency or not. The question is what is that role? And you're saying there's none other than just mercy, grace. What is it? I will give you the answer that was given in the hearing by the witness, Mr. Salvatore, who's the vice president of human relations for Consul Energy. And as I recall, his response was that Consul Energy feels it has a moral obligation. But there is no contractual obligation. Isn't Consul the administrator of the plan? Yes, it is. And doesn't it have an obligation to the persons to whom it provides the plan as an administrator? Or does it have a position? I don't understand your position at all. I mean, it seems to me your brief says one thing, and now you're coming in and just sort of flopping around and saying they're doing this out of the benefit. They're doing this as an administrator. Well, I understood Judge Gregory. No, you said he didn't have any contractual obligation. They were just doing that out of the love of their heart. I understood Judge Gregory to be asking about the financing of the benefits as opposed to the administration. It's more than just plan administrator. Obviously it is. It has to be because that's what you're explaining. And you're right. There was an answer about funding. It's more than that. An administrator just administers, but there are no funds to administer. It is not the facility of the funds if none exist. That's the biggest fiction I've ever read. It's like saying I manage the building, but there's no building. I'm really confused by your question. I don't have any questions. I don't have any questions. They're just available contractual obligations. Could I have a clarification? I think the time has expired. Can I ask my clarification, please? The collective bargaining agreement provides for health care benefits, doesn't it? Correct. And the subsidiary coal companies have a contractual obligation to the union to provide benefits. Correct. In providing the benefits, they have this plan that's administered by console. Correct. And console then has the direct obligation to the subsidiaries to provide this plan and to satisfy the obligations that the subsidiaries have in providing the plan. Correct. So why is that all so gratuitous? Why isn't that just a normal relationship where the collective bargaining agreement is with the coal companies and the coal companies agree to provide a plan, and the parent in this case is the administrator of the plan that it provides to all the subsidiaries? But that's not a member of the association and it's not a signatory of the collective bargaining agreement. This is not a question of truth or justice. This is a question of the way the parties organize their arrangement. And if you want to get to the bottom of it, you can sue the coal companies. They're still around. And the coal companies can sue the administrator if the administrator failed. Well, that's correct. I mean, the companies did sue in Pennsylvania under the somewhat analogous issues that are raised in this case. You seem to have overlooked this in answering Judge Gregory's questions. I mean, I thought it was pretty clear in your brief and in the documents, but you seem to be dropping all this structural importance. No, the structural importance is the formality of the case, of the legal relationships. Thank you. Thank you, sir. Thank you. Mr. Trena. Thank you. Good morning, and may it please the Court, my name is Art Trena. I am here on behalf of the retired coal miners arguing for affirmance of the preliminary injunction. There are a lot of things I was prepared to talk about today, but I want to jump right into the issue that it seems the judges are most interested in, and that's 301 jurisdiction. There's one thing I want to start with as a factual matter. We need to clear the record, or at least clear a misconception about the record in this case, and that is this notion that the subsidiaries are separate corporate entities with officers and directors. That's directly contrary to an admission that the chief witness, the HR director for Consol, made at hearing. When I asked him, who is the person at Helvetia Coal, at Laurel Run Mining, who makes the decisions about the health care plan? He said, I don't know that person's name. And I said, and that's because there are no people at those companies. They don't have any employees, officers or directors, or anybody to make decisions. And he said, yes, that's correct. There's nobody at those companies. These are shell subsidiaries. They don't have any independent agency of their own. Consol is their parent company, and Consol makes all the decisions with respect to how these companies structure themselves and their relationship to the collective bargaining agreements. All of the obligations under the agreements are funded by Consol, are negotiated by Consol. The litigation is undertaken by Consol. All the letters that were transmitted to the retirees that started this dispute that we filed the rod in response to came from Consol. These companies are empty shells, and that's what the judge found. Even if that's correct, we'll assume that's correct, how does that change the analysis for Section 301 subject matter jurisdiction? It establishes one of two routes to get 301 jurisdiction. That is the agency route. And the judge did here find that Consol is the agent of the subsidiaries for all material purposes here. Two questions along that line. Can you show us where you pled agency in your complaint? Oh, if you'll allow me to go back and retrieve the complaint. Sure. I'm looking here at the complaint. There was an amended complaint, and while I'm not able to find it and frankly don't want to waste too much time looking for it, I can tell you that we did note in our complaint the facts that would establish the agency. We noted in our complaint and alleged in our complaint, I believe, and this is from my recollection in the amended complaint, that the individual subsidiaries did not have any directors or personnel. Whether we actually affirmatively allege that Consol is their agent, I'm not sure. We certainly made that case at the preliminary injunction hearing, and I believe we made that case in writing in our motion for a preliminary injunction. So are you able to show and prove agency you haven't pled it? And how does the defendant know to answer your complaint if you haven't pled it? Well, I believe that we did plead the facts that would establish agency. And again, I don't have the complaint in front of me. And I know that that was a point of contention at the hearing on the motion for preliminary injunction, whether in fact, as I just discussed, there was evidence entered into the record to establish that. It doesn't matter whether it's agency or some other type of operative legal liability claim. If you haven't pled it and the first time the opposing party is apprised of it is when there's evidence being introduced on a theory of liability that wasn't pled, that's not permitted. Well, I understand your point, Your Honor, and the pleadings will speak for themselves as to whether we pled facts that would establish agency. Let's assume you pled it. What's the theory of agency law that makes the agent liable for the principle? I'm not arguing liability here, Your Honor. I'm arguing subject matter jurisdiction, and Section 301 clearly provides subject matter jurisdiction where a labor organization sues the agent of an employer. I can tell you I have that in front of me. Section 301 provides for suits for violation of contracts between an employer and a labor organization. It says that these suits can be brought in any district court of the United States. The statute defines the word employer as used there under Section 152.2. The statute says that the word employer as used in this section, quote, includes any person acting as an agent of an employer directly or indirectly. It's a unique jurisdictional statute. All right, but that would be to establish jurisdiction over the principle, which in this case, it would be the ombuds. It would be the subsidiaries because you're trying to establish jurisdiction. You're right. You're not trying to establish liability, but that's jurisdiction so that you can reach through the agent to get to the principle for whom the agent acts, which in this case would be the subsidiaries. Agreed, Your Honor. Agreed. On this theory of agency, you've stated it correctly. And Section 301B, I just read you 301A, 301B reaffirms this unique statutory framework for the enforcement of labor contracts. It reinforces this by providing, and I quote, any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agency. Right. I don't think there's any disagreement over that. But here the party being enjoined would be the agent. It's not a question then of, is there jurisdiction that is obtained over the principles by going through, in effect, service on the agent. You're correct. I mean, that's as clearly as statute provides for that. But that's to establish jurisdiction, and the jurisdiction then would be to render some sort of a judgment against the principle for whom the agent acts. But here the judgment is entered against the principle itself. I believe here the judgment is entered against the agent consult. The injunction order is... The agent itself. And so... Yeah. See, that's what doesn't make any sense to me, that you would establish subject matter jurisdiction through the agent over the principle. But then you're enjoining not the principle. You're enjoining the agent. You're enjoining the principle as well as the agent because the rule of civil procedure, I can't quote the number off the top of my head that provides for... Did you voluntarily dismiss the principles? No, I did not. We did not. The court dismissed them on personal jurisdiction grounds. But the important point here is that the injunction itself, if you look at the injunction order and the rule providing courts the ability to issue injunctions, say that the agent consult is bound by the injunction, and any person or entity acting in concert with the agent is bound, and that's how the ultimate principle is bound. The injunction issues against consult, which is really the mover, the player here. There's no such thing as a subsidiary except on paper. The principle is bound because agent is bound, because they'd be acting in concert in any act they would take contrary to the order. Is this in agency proceedings right now? Is it in arbitration proceedings? It is, Your Honor. The arbitration is currently being processed, and I would expect based on the time it normally takes for... and consult is participating in that process, Are they a party to the arbitration? Yes, they've submitted... No, are they a party to it, a formal party? Is consult energy a formal party to the arbitration? I frankly don't know off the top of my head, Your Honor, how the arbitration proceeding is. If that's not handled, that's handled by the trustees, and I don't know. I'm not representing the UMWA. That's pretty important because a preliminary injunction is to apparently await the outcome of the arbitration, right? Correct. Correct, Your Honor. And the arbitration is the only persons who agreed to arbitrate were the coal companies, subsidiary coal companies. Well, I do disagree on that point, but it goes away from the agency ground, and it goes back to the letter agreement that we referred to earlier. So that letter agreement establishes that consult is... that letter agreement was signed by consult's CEO in his capacity as the chief of the BCOA negotiating committee. That's correct. We're not suing under that letter. We're suing under the employer plan. What that letter does is show that the bargaining parties, the BCOA, led by consult at that time, they affirm... Just a minute. Why do you say the association was led by consult? The association... There was a CEO served as a negotiator. Correct. That's true. But that wasn't consult. He was serving as negotiator for the association. The association at the time was dominated by consult. If one employer has a majority, it's 50% of the... I think it's the coal production. But you haven't alleged the collapse of corporate bathtub theory where the corporate structures have to be ignored, and nor did the district court find that. So if we're going to observe any kind of order in contracts and corporations and liabilities, you have to plead a breakdown of that and demonstrate it. And what you really have here is you have consult providing a unified health care plan to its subsidiary coal companies, which are the parties to collective bargaining agreements. And the coal companies provide that, and they're the ones that agree to arbitrate. My guess is that the parties to that arbitration are only the coal companies. We're pleading agency of the purposes of subject matter, jurisdiction, liability first. But let me get to that point directly. And this is where I was going with that letter. We're not suing under the letter. We're suing under the employer plan. What that letter does is it establishes... You're suing under the collective bargaining agreement. You have to be. We're suing under the employer plan and the collective bargaining agreement. We're actually suing more directly under the employer plan because it's the employer plan that has the resolution of disputes procedure in it. So the employer plan is a collective bargaining agreement. It's incorporated into the NBCWA. We're suing under that collective bargaining agreement, the employer plan. And what this letter does is it shows that Consul is the sponsor of that employer plan. Consul is not merely an administrator. Consul is a party to that employer plan. It confirmed that itself in this letter signed by the BCOA and the UMWA. It doesn't say all of Consul's subsidiaries are party to the employer plan. It says Consul is party to the employer plan. It says Consul is a sponsor of the employer plan. And Consul's CEO, granted in his capacity as head of the BCOA, affirmed that fact in this letter. This letter is evidence that it's Consul that's a party to the employer plan and that we're bringing this dispute under. Consul is the defendant in this case? Yes, the parent company, correct. So the individual subsidiary... Wait, wait, wait. Yes, John. So what shows that? The letter. All right. I'm looking at the letter. Where does it show that? Turning to 167. So this is a letter that was sent at the conclusion of the negotiations leading to the NBCWA. And if you look at the letter, it says, Dear Mr. Roberts, the President of the Union, this is to confirm our agreement regarding the terms of the individual employer plan sponsored by Consul under the provisions of the NBCWA. So is that Consul Energy, Inc.? Is that an acronym for the Consul subsidiaries or for some other set of entities? How do we know that? That's Consul Energy. None of the subsidiaries have the name Consul. How do we know that? None of the subsidiaries have the name Consul. They're Hovatia Coal, Laurel Run Mining, et cetera. Consul only means the parent company. It's the only name that the parent goes by, right? Correct. Consul, in all its form, means the parent. That's your basis. That's just something that we know. Well, that's backed up by the world of facts that Judge Gregory was talking about earlier. It's only Consul that makes any decisions with respect to the plan, that negotiates the contract. In fact, the benefit plan itself came underneath this letter. This letter says it's more than just establishing a drug formulary and some of the other things that it does discuss. It starts by saying this is to confirm our agreement sponsored by Consul, that the individual employer plan is sponsored by Consul under the provisions of the NBCWA. This establishes that, yes, while the individual subsidiaries are party to the NBCWA, the collective bargaining agreement that sets out terms and conditions and provides for the lifetime guarantee, the employer plan itself was set up by Consul. That comports completely with all of the facts that we'll call reality, how the plan is administered, what kind of decisions are made. Instead of having the IEP that was put together by Consul to provide health benefits under the collective bargaining agreement, the collective bargaining agreement had brought in a plan administered, written, and sponsored by UnitedHealthcare. Would that mean UnitedHealthcare could be sued for arbitration? No, because they would only be the administrator. They wouldn't be the sponsor. UnitedHealthcare would never send a letter saying we sponsor this plan, we're a party to it. If they did, they would be liable. If they did say we're the sponsor, they would be liable, but they wouldn't. They would say we're the administrator. This letter confirmed, I just want to stress that this letter is not standing alone. You have to look at it against the backdrop of the reality of how Consul administers these plans. The individual subsidiaries don't have any real existence other than on paper, and they haven't really maintained the corporate form because they don't even have directors. They don't even have employees, and that's not an allegation. That's an admission by Consul. Now, I believe I've answered your questions with respect to subject matter jurisdiction. I really would like to get into arbitrability. I think that's an important point here. This is a pre-expiration dispute. The NBCWA and the employer plan, well, the NBCWA expired December 31, 2016. This was filed November 1. So, Lytton and all of those other cases that we spent a lot of time in the brief discussing don't even come into play. The presumption of arbitrability applies, and this dispute is arbitrable. Even if you do get into Lytton, we satisfy each of the three exceptions, and power mountain coal goes through the analysis of why. I'm moving through quickly here. The employer repeatedly talks about the Tackett case as changing the law on vesting. That is a decision that the arbitrators need to make, whether these benefits vested. If it's to be used to determine whether the dispute is arbitrable, the Fourth Circuit's decision in Cumberland says we look only to see whether the benefits are arguably vested. Tackett only stood for the proposition that the Sixth Circuit's yard man presumption, where the Sixth Circuit had presumed that benefits vest, that that's no good. None of the decisions, the many decisions that hold that NBCWA benefits vest ever rested on the yard man presumption or any other presumption. The court has always been careful to its credit to use ordinary contract interpretation to find that the benefits vest, and that's exactly what you'll see in power mountain. You won't see any presumption that benefits vest. Tackett did not create a negative presumption that benefits do not vest, and this court in Barton didn't do that either. You can look at footnote two where they say they would resort to extrinsic evidence. So the benefits have vested, and that's more than you need to establish that the dispute is arbitrable. When you say they vested, I don't take the talent to say that they contested their lifetime benefits of some type. Maybe they did. I think he did that here today. But that the level of benefits is not established under the agreement in perpetuity. They could only be changed by joint agreement between the UMWA and the employer, but that does not defeat vesting. That's the holding in power mountain. So under your theory, then, even though the agreement has expired, which set by its own terms benefits that only last during this contractual period that ended, I think, last year, that as long as the union doesn't agree, those level of benefits continue until the last retiree is deceased. Correct, or until the employer completely goes out of business and all related companies do, and that's the holding in power mountain, the southern district of West Virginia case. Does that say that, though, in the collective bargaining agreement? The southern district of West Virginia discusses that directly on point. It analyzes that language in the power mountain case. I would refer you to that. I could go through it, but I have a limited time. Agreement says that that exists. This is a contractual agreement, not the gloss that a district court puts on it. And so if you're going to agree for benefits for a certain period of time and a level for those benefits, there needs to be a contract that says what that is. And the contract does say that the benefits vest for life, and that's the benefits in the employer plan. That's my question. What benefits vest for life? The benefits of the employer plan under that contract vest for life. All right. So show us the provision in the contract that says that. The lifetime benefits provision. Your Honor, I have 20 seconds. You have more than that, Mr. Woodrow, with 20 minutes over. Okay. Let's see. I have the NBCWA here. There's the lifetime language. And then I think the easiest thing to do here, because the court in the southern district of West Virginia in Power Mountain, they went through this exact analysis that I would give to you now. So if I'm not able to do it well. In the same language? Yes, same contract, same language. Language hasn't changed. That's in the record. The language has not changed. Same contract, same language. I could go through it now. It would take me a little while, and it would be cumbersome. It's very clearly spelled out in the district court decision in Power Mountain, which this court did affirm. I'm scrambling here to get to that. Power Mountain looked at this language. It's at Joint Appendix 204 and 205. They noted that on 204, which addresses amendment and termination, Section B, post-termination amendments, says subject to Section C, following termination of the wage agreement, the plan may be modified, amended, or terminated by the BCOA and UMWA or by BCOA or the employer as permitted by law. That language suggests that changes can be made under some circumstances. But remember, it's subject to Section C. This is the analysis that the Power Mountain court did. Look at Section C on the next page, 205. Special rule, the employer will provide for life only the benefits of its own eligible pensioners who retire between February 1 and December 31, 2016. The benefits and benefit levels provided by the employer to this plan are established for the term of the 2011 wage agreement only and may be jointly amended or modified in any manner at any time after the expiration of the 2011 wage agreement. What Power Mountain said is B, Section B allows for modification of the benefits as they relate to the active employees and other employees who are covered. But with respect to pensioners, there's a special rule in C that says they can only be modified by joint agreement between the UMWA and the BCOA. Now, why is that? Why do they do that? Because in each successive NBCWA, benefits may be modified by joint agreement going forward. Now, CONSOL is no longer in the BCOA. It's gone out of business. So there's no – these benefits will be fixed at these levels for life unless the UMWA and CONSOL come to some other agreement as to how the benefits might be modified. But that hasn't happened, and there, in fact, haven't even been negotiations to do that. CONSOL's not a party to this agreement, is it? This NBCWA agreement right here, they are. No, where are you referring, 204 and 205? This is the employer plan at 204 and 205, and CONSOL is a sponsor of the employer plan as was confirmed in the letter on, I think, Joint Appendix 167, the July 1 letter that we went through earlier. CONSOL is the employer, and it's – It's the employer? Yes. It's not the coal company's employer. If you go back to the beginning of this agreement, that's what it provides. Here, CONSOL is the sponsor. And the association is authorized to negotiate on behalf of the subsidiary coal companies. Yes, that's correct. CONSOL is not a member of that association. You are absolutely correct about that, but CONSOL sponsored the plan, and that's what was shown in this letter. And the subsidiaries, we couldn't reach an agreement with the subsidiaries. They don't exist except on paper. It's really CONSOL. There's one other additional factual matter that did not make the district court to change, and I would like to make the court aware of. You didn't plead some sort of alter ego theory. Correct, Your Honor. It's agency. And you didn't ask to pierce the corporate veil or any of that sort of thing? No, Your Honor, because Section 301 jurisdiction only requires the finding of agency. The fact I would like to get to shows that – CONSOL testified here that there's no intention to terminate benefits. I disagree with your concept of that, and that the agency description in the statute establishes the subject matter jurisdiction of the principles for whom the agent acts. Why would you still be required to plead alter ego for some sort of a piercing of the corporate veil type of cause of action in order to reach the agent? We may. I don't know, but we may have to do that if we wanted to assess liability against CONSOL. But for the purposes of jurisdiction, the statute is clear. All you need to do is establish agency. So that's what we did. And your theory, then, of jurisdiction with respect to enforcing an order against the agent is that the letter of 167 shows that the CONSOL defendant in this case is the agent? No, Your Honor. There are two different theories for 301 jurisdiction at play here, and the court found both of them whole here. One is that CONSOL is, in fact, the party of the sponsor of the employer plan. So there's no agency theory at issue there. Where's that in the record? I've looked at the plan. It doesn't refer to CONSOL. The plan refers to DCOA because it's the same employer plan that all the companies then have to adopt. What the letter is, is the letter is from the DCOA saying CONSOL has agreed to adopt and sponsor the plan. So where is that either in the collective bargaining agreement or the IEP? The collective bargaining agreement and the IEP are negotiated by the DCOA, and then the individual employers like CONSOL and the other companies then will send a letter adopting. They'll send a letter adopting. I know, but CONSOL didn't do that. It did. That's the letter. The July 1st letter is CONSOL saying we adopt. That's not from CONSOL. That's from the association on behalf of the coal companies. CONSOL is not even a member of that association. Well, it's CONSOL's CEO, and he's saying CONSOL sponsored. CONSOL sponsored. Now, he did sign the letter in his capacity as DCOA. That would be referring to the administrator. I don't understand. You're saying that that letter somehow makes CONSOL a member of the association, somehow makes it a signatory to two formal agreements negotiated with the union, and somehow obligates it to arbitrate without having any arbitration clause? It says it's the sponsor of the employer plan and the employer plan. It's an administrator, sure, or a sponsor administrator. It doesn't say administrator. Well, what's the difference? It says sponsor. A sponsor is a party to the agreement, not just an administrator. Well, they're not a party to the agreement. To the employer plan they are, not to the NBCWA. I've looked at it, just looked at it. Show me. The July 1 letter is the evidence that we have that CONSOL is the sponsor. All right. I understand. Now, the other – Judge Greger, you asked a good question of CONSOL. What is it that keeps them paying these benefits? They say they're going to pay the benefits. There's no intention to terminate or cut. So what is it? Is it their goodwill? They're standing up here and saying the benefits don't vest. What is it, their goodwill? Goodwill is not sufficient. And let me tell you some facts that are in the record here that show why they're not. I mean, I think common sense would say a corporation doesn't carry gratuitous costs, especially when going out of business. Here in 2015 – let me step back and say in 2016, CONSOL started sending letters to our retirees saying that they were going to, you know, modify, change the benefits. Each one of those letters had language at the bottom that said, we make no promise, we reserve the right to terminate these benefits at any time, and we make no promises. Why was that particularly scary to us and the retirees? In 2015, just before they started sending those letters, CONSOL terminated the health care plan it had maintained for its non-union supervisory employees. And it told those employees – and this is all in the record – we're going to give you an HRA scheme, the exact same one they promised to us, really, where for five years we'll provide you HRA benefits, and that will transition you out of this group health insurance. And within one year of making that promise, CONSOL terminated those HRA benefits as well. That's in the record. CONSOL admitted that it did that. And when I confronted CONSOL's witness with these facts and said, isn't it true you terminated these benefits? And then I said, look, you've got the same reservation of rights language saying you can So what's up? He said, in those letters that we sent and in agreements that we had with our non-union retirees, we had disclaimer language that said we could terminate at any time, and that's why we were able to do it. That's exactly what they want to do to the union retirees as well. And as soon as they get – if they're allowed to establish this HRA scheme that includes language that says we can terminate at any time, their very recent actions show that they will do exactly what they say. It's not just boilerplate. It's them giving themselves the ability to terminate very soon. If you give them the ability to do it, they will. They're making decisions properly in the interest of their shareholders, and they will do that, and they did it. Was there any arbitration provision with respect to the non-union employees? No, Your Honor. They did not have a collective bargaining agreement. So whatever risk there would be in this case, if what you represent is correct, we'll assume it is, that's pending the outcome of the arbitration that's ongoing now. With respect to our unionized retirees, correct, Your Honor? That's the only parties, right? I'm just maybe confused about whether we're talking about the non-unionized supervisors that I just talked about? They're not parties in this case. That's correct, Your Honor. With respect to the parties that are before the court today, yes, the only time period that is relevant here is before the arbitration decision is rendered. I'm sorry, but I don't feel that I understand your question, and I'm not trying to be obtuse. Well, once the arbitration decision is rendered on what happens under this collective bargaining agreement, won't that resolve all these questions? The questions about whether the benefits are vested and will continue? I believe it will, yes, Your Honor. I believe it will. Well, that was all that was asked. I'm sorry, I didn't understand, but you're right. Yes, they will. The answer is yes. There's one other thing I'd like to clear up. You asked, Judge Agee, whether it's only post-65 Medicare retirees who are at risk here, and the answer you got was yes, and that's just not the case. The console has taken the position, as they said today here, that there's no vesting for any of the retirees, including those who are under 65, who are not Medicare eligible. And I do want to point out that you said that if you weren't eligible for Medicare, which included spouses of retirees, they continued in the plan as it was. They're saying, yeah, we'll gratuitously continue the plan. That's what they're saying today. But they've sent letters to those same retirees, and they've taken the position here today, that they can cut those benefits at any time for any reason. So those retirees, while they aren't being moved to an HRA scheme right now, are facing the same risk of having their benefits terminated. And even if it was only the 65 and up retirees who are at risk, when you're looking at the hollow formality test and irreparable harm, you don't look at the degree of harm or how many people will be harmed. If one person or two people lose their health benefits, that's enough. And console admitted at hearing that there are people, the most vulnerable retirees, will lose health benefits. We asked them, with respect to a retired minor who's 90 years old in a nursing home and is incapacitated and unconscious, how is he supposed to sign up for this HRA scheme? I said, what happens if somebody doesn't sign up for the HRA scheme? And Console's witness answered, truthfully, that person will lose coverage. And I said, what about the 90-year-old who can't sign up? He said, that person will lose coverage. When we said coverage, that should be your Medicare supplement coverage. For a post-65 retiree, that would be the plan that covers 100 percent all costs that Medicare does not cover. Whatever supplements to Medicare, they would want to, whatever the letters are for that. Yes, correct, correct. If you have a pre-65 retiree who is similarly incapacitated, that person would lose all of their care. This is a preliminary injunction pending the arbitration outcome, right? Correct, Your Honor. And what's the status of the arbitration right now? It's my understanding that I know for a fact, actually, that Console is participating in the arbitration. No, no, I'm asking what's the status of it. The arbitrators, the trustees, I believe, are now working on an opinion. Has there been a hearing? There aren't hearings in these proceedings. It's paper submissions, and all parties have submitted an opinion. You don't have any oral presentation to the arbitrator? Not that I'm, I don't believe so is my answer to that, Your Honor. Usually, I can tell you, usually you do not. I do not believe there was one in this case. So this has been submitted on paper, and the arbitrators are now considering it? Correct, Your Honor, yes. And if they came out with an opinion tomorrow, that ends the preliminary injunction? The court entered an order that said that the arbitration, or excuse me, that the preliminary injunction will dissolve on issuance of the arbitration and further order of the court. I believe they left that window available so that Console can come in and say, well, we want to contest the validity of the award, and we want to move to vacate it. Yeah, but isn't there a process to do that directly? In other words, why should a court get in collaboratively? If the arbitrator comes in with a decision, either party can address that to a court, and that court can administer whether it's going to be state or not state or whatever. But it seems to me the preliminary injunction here is only functional based on the substance of what is going on pending the arbitration decision. Yeah, I can only speculate as to why the court said that the injunction dissolves on further order of the court following arbitration. My best guess, my speculation, is that they wanted to allow for the parties to come into a court that's already heard all of these arguments and is well-versed in the issues to have that court decide whether or not the decision should be vacated or enforced. That's my speculation. They could do that under the Arbitration Act anyway. Yes, that's correct. So now, is the United Non-Workers, are they represented? Do you all represent them in this arbitration? No. I personally do not. There are trustees, two trustees appointed by the United Non-Workers and two trustees appointed by the BCOA, and they hash out these disputes, and then parties can make submissions. I know Consol has made a submission. And the UNW, don't they make submissions in this arbitration? Yes, Your Honor, but the reason I'm ignorant as to that is because I don't handle that work. But I believe the answer is yes. I understand, but your client is participating. Either through the two appointed trustees appointed by the UNWA or by making submissions, yes, Your Honor. I'm not sure which one it is. I'd like to conclude, I know I'm a little bit over time here, by highlighting just a couple of other facts that aren't in the record. Well, first I would like to say it's not, in fact, extremely rare that courts will enjoin modifications or termination of health benefits. I've got, in fact, a long list here of courts that have done that. They're cited in the briefs to the district courts. I'm counting one, two, three, four, five, six, seven that I found just preparing for this argument. You have one in the First Circuit in Steelworkers v. Textron. Retired workers would likely suffer emotional distress, concern about potential financial disaster and deprivation of necessities. They found irreparable harm. The Third Circuit in Fort Pitt Steelcasting, United Steelworkers v. Fort Pitt Steelcasting, finding hollow formality with the change of insurance benefits. You have a very instructive case out of the Southern District of Ohio. You notice these are industrial districts geographically. Why you don't have so many cases out of the Fourth Circuit? Well, you have more heavily unionized industrial workplaces up in these other circuits. The Southern District of Ohio said they issued an injunction saying, plaintiffs are now covered by the group health insurance plan, but despite the opportunity to convert their group coverage to individual policies, many of the plaintiffs were not able to financially afford to convert their policies or at best were able to convert only part. To presume that one not able to afford health insurance coverage is harmed only in a monetary sense is to ignore the realities of the situation. The adequacy of a monetary award to a person unable to afford health insurance coverage rests on the assumption that the person will seek and obtain necessary medical care, will pay for the medical care received at that time, and will simply be recompensed later by the defendant when a judgment is rendered. That's irreparable harm. They issued the injunction. By the way, in the record here, we even asked. Consol's witness on the stand said they have not yet, this is at the preliminary injunction hearing, they have not yet come up with a mechanism that would avoid a situation where the retirees would have to pay for their own medical care out of pocket. This is even the retirees who are able, who have the wherewithal to sign up for the HRA plan, even those retirees would have to pay for the medical care and prescriptions they need up front with the hope of later being reimbursed by Consol under the HRA scheme. That's going to leave them making tough choices about what they do with their limited incomes, hoping that they'll be reimbursed at a later date. That's irreparable harm. And this is something that Consol said. They said we haven't come up with a mechanism yet to address that. That's really, in my mind, the end of the analysis. But I do want to point out that that's an especially concerning thing with regard to these retirees. UMWA retirees over the years, UMWA retirees have much smaller pensions than those received by other industrial workers. And the reason they do is because for generations they've bargained for this comprehensive zero-dollar lifetime health insurance. Why? Because mining coal destroys your body. The trustees of the health plans looked at the UMWA retiree group in 2004 and 2009. These studies are in their reference at Joint Appendix 138. They weren't contested at all at the hearing. The population of UMWA retired minors had a health burden 33 percent higher than a geographically similar Medicare patient. The study showed retired minors had a 63 percent higher incidence of congestive heart failure. For cardiorespiratory conditions, it's 32 percent higher. For lung problems, a 31 percent higher incidence. And they don't have the same pensions that these other retirees who are getting preliminary injunctions have. They have meager pensions that they've exchanged for this lifetime great world's best health care. And now they're at the mercy of this court to affirm that injunction, to make sure that they're not put in a situation where they need to make a decision between whether they pay their rent or whether they pay their medical care and hope to be reimbursed later. These retirees, to put it plainly, are poorer and sicker than any of the rest of us, than any of the retirees that issue in these other cases where these injunctions have issued. And this is something that Elizabeth Dole, when she headed the Coal Commission, recognized. In her report, she said health care benefits are an emotional subject in the coal industry, not only because coal miners have been promised and guaranteed health benefits for life, but also because coal miners in their labor contracts have traded lower pensions over the years for better health benefits. And several of our retired miners in this case testified that they live paycheck to paycheck. And when they heard what happened to the supervisors who are their neighbors, they were terrified. And they came running to us, to the UMWA. And we went immediately on November 1st, before this agreement expired, and we filed this rod, saying we need the company to send a letter to these retirees, assuring them that their benefits are, in fact, for life. And that's the dispute that's pending arbitration. And this injunction merely gets us to that arbitration. And then Console will have every right to challenge the validity of the arbitration award. But these miners are really dependent on this court in the meantime. If there are no further questions, I'll rest there. Thank you, Counsel. Mr. Woodruff, you have a few minutes. Appreciate the court's patience. I know this has gone on, but there are a few things that I feel need to be corrected in response to some of the statements made. First, I think Judge Agee focused on a point that's very important for the question of the letter that was signed by Mr. Dulius as chief negotiator for the BCOA. Actually, at that point in time, in 2011, Consolidation Energy, the parent corporation, had many active companies. The ones that are subject to this particular case are four inactive companies. They were inactive then, too, but they're the only ones that Consol currently owns. And at that time, when the negotiations occurred and the letter was signed, you can see at page 300 of the joint appendix that the letter included Consolidation Coal Company. Consolidation Coal Company was actually the flagship signatory company of Consol Energy. So I think that when Judge Agee pointed out Consol Who, we must keep in mind that at that point in time when that letter was So there was, in fact, a company called Consolidation Coal Company, and it, as the parent does, went by the name of Consol. Consol was almost like a generic name for that complete group of companies. Pretty much everybody has referred to it as a whole as Consol. And it's only when we get to these situations as to which entities have bound themselves legally to what kinds of agreements, do the particulars of which one of these entities are we talking about really come into play. Secondly, I would point out that when the court looks at the amended complaint that's in the record, you will find that it was simply a single allegation. The allegations actually were that the defendant, Consol Energy, was a signatory to the agreement. There was no allegation that it was a joint employer, alter ego, piercing the corporate veil, nothing like that with respect to the defendant parent company and the subsidiary entities. It was simply a request for an injunction against what the union labeled as a signatory Consol Energy in that complaint. Moreover, I would point out that the union has demanded that these inactive subsidiaries sign successive NBCWA agreements over the years knowing that they were inactive. So the union has not challenged the corporate structure or status of the inactive companies. They've actually insisted that they continue to sign labor contracts, which they did. But they are responsible for whatever they sign, whether or not they have active mining operations. In response to Judge Niemeyer's inquiry about who's party to the arbitration, Consol Energy is not party to the arbitration. The signatory companies filed a position with the trustees because the trustees informed us that they were going, and this was back in February, they were going to go forward with the arbitration before the injunction was entered. Under protest, the signatory companies filed their positions and reserved their rights, saying that you don't have authority over this because this is a post-expiration change, and you don't have authority once the contract expires. Those arguments are all pending, but it was done with the reservation of rights, and it was done only by the signatory companies. Consol Energy has never agreed to participate in or be bound to the arbitration. Furthermore, Consol Energy has never, if it was, it was by accident, has never sent letters to the non-Medicare eligible retirees saying that their health plan is going to be changed. Early on, it's possible that one of the letters just informing them about discussions with the union may have gone to all retirees, but as the focus on moving to the HRA arrangement crystallized, it was only those Medicare eligible retirees who were communicated with. There's no basis for any pre-'65 individual to claim that their benefits are threatened or going to be changed. That is purely status quo. Ann, do you see the red light? Thank you. All right. We'll come down to Greek Council and proceed to our next case.
judges: Roger L. Gregory, Paul V. Niemeyer, G. Steven Agee